May it please the court, my name is Louise Arkell, I'm from the Office of the Federal Public Defender and we represent Appellant Rockmon Fulton. If I may please have three minutes for rebuttal. Thank you. The errors in this case seriously affected the fairness and integrity of the trial. What are the errors that seriously affected the fairness and integrity? The first error was Agent Scartosi providing what was essentially an alibi for Ricardo Barnes. But didn't, did you try the case? I did not. Okay, whoever from your office was trying the case, I thought did an incredible job with, how do you pronounce his name, Starosi, to the FBI agent's testimony. He reached a conclusion which was, and there's a separate problem there in terms of his testifying as a lay witness it seems to me, when what he was doing was relying upon the records and drawing some information from that which would seem to be only an expert with those kinds of cell calls could make. But that aside, I thought that the trial counsel did a very credible job destroying that conclusion that it couldn't have been Barnes because Barnes was on the telephone at the time of the bankruptcy. My colleagues did do a good job. I don't want to detract from that. But we are here, they did not object to that testimony. We are here on plain error review. The problem was that Agent Scartosi not only testified to that on direct, but on, and on cross. He said it several times. He said it on redirect. And he said not only was Barnes on the phone and that Barnes couldn't have done it because the robber was not, did not show a cell phone, there was no evidence of the robber using a cell phone at the time. But the error was also that Barnes himself was on the phone. It wasn't just someone was on the phone, it was Barnes himself. Wasn't that cleared up in cross-examination? It was not cleared up. He said it could have gone to voicemail, but. So the jury knows it could have gone to voicemail. But the agent on redirect reiterated, and in fact, I think doubled down on, it could have, hypothetically, in a perfect world, it could have gone to voicemail. I think her name was, the defendant called the witness and said no, it could have gone to voicemail. It did go to voicemail. There's some little magic that they can glean from these records that tells, that told her it was routed and she testified calling it to voicemail. I don't think that mitigated the, the prejudice coming from Agent Scartosi's testimony for a couple of reasons. One, you have the case agent versus a defense witness. I think. Case agent clearly didn't know what he was talking about. I'm sorry? A case agent clearly did not know what he was talking about and reached the conclusion that he had no business drawing. I think a concern, though, is that the jury does give, and courts have recognized this, juries can give case agents, FBI agents, they have sort of an aura of reliability. Certainly when talking about things like technical expertise, they can. But also, they were not equivalents in this sense. On one hand, Agent Scartosi said Barnes was on the phone, whereas the defense witness, Investigator Dreyer, said it went to voicemail. But that didn't exclude or include anybody. Whereas... Well, you're still not making clear to me anyway why one account, that is, that Barnes was on the phone, has greater weight, greater force, than the other account, the telephone call went to voicemail. Because as... The jury did have two choices. They had two choices, but one did not include or exclude anybody. One alibied the... Why is that just a matter of credibility and weight? Because it was a lay opinion that should not have been admitted. It was error in the sense that it was a lay opinion that should not have been admitted. It was not based on... That still doesn't answer the question. Even assuming for purposes of argument that it error so prejudicial. In the circumstances of this case, maybe this... In the circumstances of this case where you have two African-American men of similar height living side by side, it was an extremely close case, sort of geographically, physically, and... We know it was one of those two men, right? Of that, I mean, that was certainly the defense... Our defense theory requires us and required the jury to look at it that way, didn't it? Yes, I think that was... You had a defendant sitting at the table and the other guy whom you're pointing at. Right. And the government's case agent, the FBI agent said, not just that I don't think it was Barnes or I reached this conclusion, but it could not have been Barnes. I think that gave the jury permission to shove aside all of the evidence relating to Ricardo Barnes... Wasn't that in conjunction with vigorous cross-examination as to why they ruled Barnes out? I mean, your theory of the case, I thought, was that this was a rush to judgment. They found Fulton and they just didn't do their due diligence on Barnes. Wasn't that your theory? That was certainly part of it. I think that was... Yes, that was the large part, but... So when confronted with the allegation that they rushed to judgment and they ruled out the wrong guy, were they not entitled to explain why they had ruled out Barnes? This wasn't... And I know the government pointed to the Christie case. This wasn't admissible for the purpose that... The Christie case involved a hearsay objection to certain testimony. It was factually and legally different. This was where there was no... There was no... The witness had to rule... The witness had to testify based on a rational perception. He did not hear Barnes on the phone. He didn't see Barnes on the phone. And I understand you're saying, assuming it was an error. And I think... I think it's clear. I think it's plain error. Your entire theory, as Judge Hardiman has indicated, resulted in defense trial counsel's use of they, meaning the prosecution, had blinders on. Right? Yes. Wasn't that the frequent refrain from the beginning right through the closing argument? It was, but I... So with that having been the theme of the defense, the prosecution was required, coming out of the box, to use every bit of evidence they had, both direct and circumstantial,  They certainly had the... That was their charge, certainly. But they had to do it through admissible evidence. They shouldn't be putting before the jury evidence that the jury shouldn't have to evaluate because it's based on speculation. It also fails that second prong. It wasn't helpful. Speculation, Barnes was on the phone, is not helpful, especially when coming from the government's summary witness, its case agent. We have to give a lot of discretion to the trial judge, however, on that prong, don't we? As to whether or not a piece of evidence is helpful to the finder of fact. Certainly. But evidence that's based on pure speculation should not be. I think it's an abuse of that discretion. It was wrong for that evidence to come in. And it substantially affected the outcome. I think you can make it clear that it affected the outcome of this case, where the bookends of this case were essentially, Ricardo Barnes on one side, Rockman Fulton on the other. And as I said, the government knocked out Ricardo Barnes and propped up... I mean, the other half of this is the other bookend. The government improperly propped up the evidence pointing to Rockman Fulton when it closed by misstating Dr. Fuller's testimony. I can get to the other half, because that's... I find what we're talking about now to be an issue and somewhat troublesome, but the I.D. seems to me really to be problematic. Whether or not it gets to plain error, I just don't know. But I don't know... Who was the trial judge? I'm sorry, the I.D.? Who was the trial judge? Judge Schessler. How the I.D. came in, how the agent gets on the witness stand, looks at a picture of someone and basically says, well, it's not Barnes because he's not cut. I'm looking at the picture now. You can't tell by looking at this picture whether or not the guy is cut or not. And given the physique of Mr. Fulton, in 67 or 68 years, I've never seen anyone in life who is more cut than Mr. Fulton. I've seen some pictures of people like that. But it's tantamount to me just saying that the agent's saying, look, this is Fulton, this is not Barnes. I don't know how you can tell that he is cut. I don't know how that comes in. I agree that it was extremely problematic, and that is another error we raise. I think when you compare, again, the government draws a false equivalent between the witnesses that the defense elicited that kind of testimony from and the witnesses that the government elicited that testimony from. So how does the government go about refuting your defense theory, which you have taken from the start they had blinders on, if they don't explain within that context why they went with Fulton as opposed to Barnes? How do they do it? I think they can stick to their peer observations and observations that meet the 701 prongs. Why was this witness, this officer witness, doing anything more than explaining, right or wrong, but explaining why he decided in terms of physical form, this is the guy and this isn't? Because they didn't have sufficient relevant familiarity with either Fulton or Barnes. And I think you can see it in the difference between the testimony of the witnesses, whereas the lay witnesses, for lack of a better word, the witnesses who knew Fulton testified his head was smaller, he was more, you know, the guy in the video was chunkier. With the two officer witnesses, you are getting he had a muscular physique describing what is almost quasi-expert testimony. You have the V-shape officer Gomez talking about... Excuse me, it's quasi-expert testimony to say that he had... He talked about his muscular physique. I think he did. I think to the jury, talking about when you have a waist... As one who certainly doesn't have one, I think I am, as a non-expert, still able to express a view on that is merely descriptive. When you are talking about the deltoids and I am going to say I forget... The guy's chest is bigger than his waist. Yeah. I mean, if you have the power of sight and you get a good look at the person, you are entitled to say that, aren't you? Pardon me, if you didn't get a good look... The question is what in your picture, right? He didn't get a good look. I mean, the picture, I can't see that in the picture. You can't see that in that picture. Right. So then the question becomes, were they bootstrapping their own observations after having seen him after the case was ongoing? Yes, Your Honor. Furthermore, I would like... I'm sorry. One of the agents didn't see Barnes until the day of the trial. Another one saw him at some point earlier. When did the agents... It seems clear from the record that whenever they saw Barnes, it was after they had focused on... That's correct. Despite knowing that, despite him being on their radar about six days after the robbery, they did not speak with him or see him until at least six weeks, maybe more like eight weeks. Was he at the trial? Was he called as a witness by anybody? He was. Who called him? The government. So that speaks to the helpfulness requirement. The jury, in I think it was somewhat unusual circumstances, got to see both people. They certainly got to see Fulton and they got to see Barnes as well. The jury didn't need... And the video and the surveillance footage was perfectly clear. This was not the kind of case where the law enforcement had to weed through many people in the photographs or grainy footage. It was quite clear. Officer Gomez's testimony, I do think, I think it's clear, veered into expert testimony when he's talking about the height of the counters and the height of the cabinets and looking at... Well, we can leave that and we can save some time. Okay. Oh, I'm sorry. Because he'd been at the bank. I'm sorry. He was 5A. He'd been at that bank and it seems to me he could probably recall where the counter came up to him and he said he couldn't lean over and raise his arm that high. He's 5A. He knows how high the counter is. I don't quite see the problem there. If he had left it at I've been there, I can't lean over, then perhaps. But not based on the height of the counters I am estimating his weight and based on the contour of the light against his bicep against the floor. I don't know what the contour... Thank you. Okay. Native Policing Court, John Romano for the United States. I'll start with the cell phone issue. All this is is a change of strategy. Cell phone evidence came in that he was on the cell phone. They completely destroyed it on cross-examination. They brought in a witness to say, oh, it might have went to voicemail, and now they want to take that back and say, oh, actually the evidence should have come at all. Wait, did the witness say it might have gone to voicemail or it did go to voicemail? Their expert said it. I think their expert said she thought it went to voicemail. It wasn't, you know... Because it was routed. Because it was routed. It could have gone to voicemail, exactly. And then the government didn't go back to that on summation because that really wasn't the point of this testimony. Well, let me take you to another issue that your adversary did not address during her presentation here but is certainly fully briefed, and that is the suggestion that during closing argument the government, for lack of a better term, played a little fast and loose with what the evidence showed, in particular the evidence with respect to the location of the GPS tracker within 1370. Would you concede that at least once, maybe twice, the prosecutor... Were you the trial attorney? I didn't think so. The prosecutor did state as an affirmative fact the location in the bedroom and that that was not what Dr. Fuller testified to. The prosecutor said that... I think perhaps the prosecutor put two things together and said Dr. Fuller said it was in the bedroom. What the evidence showed was that Dr. Fuller said it was in a particular part of the house and I think while the prosecutor was doing the summation, he had either the animation playing or the picture and he showed where the circles were overlapping and the undisputed, uncontradicted testimony from three witnesses, including a defense witness, was that location was where his bedroom was. So quite frankly, if there had been an objection, perhaps the prosecutor could have cleared that up a little bit but there was no dispute that that's where his bedroom was. So essentially he took uncontradicted testimony and put it with the expert testimony. What about the so-called lay witness identification of the picture? Basically saying, as far as I can tell, that this guy's physique is... It's almost... I was thinking just now of an analogy with the signature crime where the crime is so unique that it points to a particular individual. Fulton's physique is so unique that when you start describing someone as being cut and large biceps, you are really, it seems to me, saying that this guy in the picture is Fulton. And I'm looking at the picture now and I don't know how anybody... The V-shape, I can't see any V-shape in there. Unless I've got a different exhibit, 244, 242, 209, 208. Sure. I think the agents and officers gave helpful testimony in a couple of ways. Number one... It was very helpful. That's incredibly helpful. Well, they had studied this videotape and they said, look, we can see certain things. He's wearing a lot of clothes. He's wearing bulky clothes. He has a couple of different masks on. I think one particularly helpful thing was they pointed to two exhibits. You just said 244. They compared that to 171 and they said, look, look at 171. You can see that the contrast they're talking about, Your Honor, is he has his hands up. And so you can see he's not a big fat guy. He has definition here. 244, on the other hand, they point out, he's leaning over. He's all hunched over. So he looks big because you can't see any contrast with his clothes. It's all black. And so they were pointing out, look, we've seen this videotape. The jury gets to see it once or twice very quickly. This is a lot like the Muhammad case. And they said, look... Should not the trial judge have given a limiting instruction that all of this went to the state of mind of Scartosi? Because, you know, this was all about why did you exclude Barnes, right? I think part of this was why they excluded Barnes and part of it was why Fulton wasn't excluded. So you think, I mean, wasn't that the government's whole purpose in response to the defense coming out of the block saying they had blinders on? Sure. Is there some doubt about that? Well, a lot of that was this. I mean, here they are saying this isn't Fulton. Look, we have two witnesses saying this isn't Fulton. It's Barnes. How does the government respond to say, look, look at the picture. Look at Ricardo Barnes. He weighs 310 pounds. He does not look like him. But at the time they included Barnes, they hadn't seen Barnes, had they? Well, Gomez had seen Barnes on July 12th. He interviewed him on July 12th, and he testified both Barnes... What was the date of the interview which involved the non-girlfriend who was alleged to be the girlfriend? When he lied about the girlfriend? Yes. That was the day of the robbery. That was May 25th. So May 25th they talked to him. And who conducted that interview? Officer Wilson. Okay, thank you. Now, on July 5th they interviewed Fulton. Gomez sees Fulton for three and a half hours, and then Fulton says, okay, I lied. I really was. I didn't go to work that day. So he sees him for three and a half hours. He's seen Fulton extensively. Scartosi has also seen Fulton. He videotaped him on July 2nd, and he was at the search on July 5th. So they had both seen Fulton. Gomez interviews Barnes on July 12th, and Scartosi had seen pictures of him. Now, another helpful fact here is that Gomez, Barnes had lost a significant amount of weight by the time the trial came, and that was testimony that was on the record. And there's evidence that Fulton was attempting to look less muscular, and so that's why Judge Chesler allowed rebuttal evidence that, look, this is why he might look less muscular than he did back then. So this was all very helpful to the jury who didn't get to see them then, who didn't get to, you know, pour over the videotape like the officers did to show, like, look, this is where you can see he's got a lot of clothes on. He's not really huge. He's, you know, he looks kind of muscular. And so this was all very helpful. And, again, on submission, the government said simply, use your eyes, look at the pictures, and you can tell. So I don't really see what the problem was. Well, that's exactly what you told me. That's right. Use your eyes, look at the pictures, and you can tell. I'm using my eyes. I'm looking at the pictures. And what I'm saying is totally inconsistent with what Officer Starcozzi and Gomez, I think it was, said they saw in the picture. They described a physique that does not make itself at all apparent to my eyes in that picture. I can't see the physique they described, the V-neck, the cut. I can't see it. Well, I think what they described in the pictures was that he's not this huge, fat guy. They described someone who could be Fulton. Again, as the government said, you can't tell. You can't exclude him. It's a matter of you can't exclude Fulton based on these pictures. Of course, we can't tell it's Fulton. He's all covered up. And nobody attempted to do that at any point during time. The pictures are not helpful in terms of being able to make positive identification. Exactly. Unless they're described with such clarity that they point to the guy with the V-neck, the little waist, the muscular build. And I'm looking at 244, which is from the back. 244, Your Honor, is one that they specifically looked at and said he looks huge at 244 because he's all leaning over. I think 171 is the one that they point out. And they said, look at 171. This is not an enormous man. Again, the jury had the opportunity to look at these two guys. Again, not the way they looked then. I mean, in a way, it was more favorable, frankly, to Fulton because Barnes was smaller and so Fulton was less muscular. And the jury had that opportunity. And, again, the defendant never objected to any of this evidence coming in. Well, let's assume there was no objection. You've got the overlapping GPS ellipses in that phone call, that 418, I guess it was, that you could argue that she was confused in the content of the phone call, but that's for the jury to decide. Sure. And I asked the court to read, I guess it's 1B-5. That section of my brief lays out all the evidence. It was not, again, I didn't describe it as overwhelming, but it was very strong. It was not, you know, it was a very strong case that this was Fulton who had committed this robbery. The court has no questions, and I'm happy to rely on my brief, and I would ask that you affirm. Well, I will say one thing I learned in this case is what Spanx are. I never. Your mom and dad never spanked you or anything like that? Spanx, the garment. I think cheerleaders wear them. I don't think that. Well, even the officer didn't know what was being talked about, so I didn't feel so bad. We get different things when we read the brief. We all go in with a different kind of focus. His is different. Mine is great. Well, thank you. Thank you. If I could just address the summation argument again very quickly. The government argued that the testimony about the southwest portion was uncontradicted. The problem with the summation, with the way the government portrayed it, is that it was also uncontradicted that the GPS tracker did not provide that kind of pinpoint testimony. That is true, and that's why I asked your friend on the other side the question when he stood up. But is it the counter to that, that despite the specificity of testimony from Dr. Fuller in that regard, that it was still a fair inference for the prosecutor to ask the jury to draw from the expert testimony? It would have been okay as an inference. It was not okay as an asterisk. The prosecutor could have said the technological evidence was clear that it was the southwest corner. And, by the way, if you look at this, you'll see that his bedroom is in the southwest corner. That's okay, but to say the bedroom is not okay. In the highly unusual circumstances of this case where the error rate, the certainty circles, the confidence level put that GPS within feet of Ricardo Barnes, it really was incumbent upon the government to be precise in this case. In feet of Barnes and right dead on top of the bedroom of Mr. Fuller. I don't think you can say that. Given Fuller's testimony, the government emphasized this was their critical, one of their critical witnesses. Where was the money found? The money was never found. That speaks to the circumstantial, this was an entirely circumstantial case. No money, no gun, no clothes. So really it comes down to the fact that your client, they caught him in some lies and they didn't, in your theory of the cases, they didn't catch Barnes in any lies because they never focused on him and didn't investigate him thoroughly. Well, they did catch him. Well, they got him about his whereabouts that day. His whereabouts, and that's a critical, they gave. But his lie helped really measure up to the lies that cut your client. Only if you rule him out entirely. His lie about his whereabouts, I think, did go to leaving him in the case, contrary to Scartosi's testimony, knocking him out violently. He didn't call and say, hey, are there any police at the Kmart? He didn't lie about, he didn't call in sick to work. There's a lot of other evidence that your client has to suffer with at Barnes. They don't have on Barnes, right? I would disagree. Barnes, you could almost make the same case against Barnes. He had financial difficulties. He could not account for his whereabouts that day. What was his lie? His lie was that he was not in the Victory Gardens area until the evening, when, in fact, his cell phone. At the very time of the bank robbery. Even at the time of the bank robbery, it was in that sector. Scartosi admitted that. But the police gave Ricardo Barnes the benefit of the doubt by not calling that a lie. They said it corroborated. Whereas every inconsistency that Rachman Fulton uttered was called a lie. Unless your honors have any. I urge you, this trial was unfair. I urge you to vacate. Thank you very much. Thank you very much, Ricardo.